No. 90-404

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

---

THE TRUSTEES OF THE WASHINGTON-IDAHO-MONTANA
CARPENTERS-EMPLOYERS RETIREMENT TRUST FUND
AND THE TRUSTEES OF THE LABORERS - A.G.C.
PENSION TRUST OF MONTANA,

        Plaintiffs and Appellants,

   -vs-

THE GALLERIA PARTNERSHIP, a Montana general
partnership, et al., and MARBLE'S MOVING,
STORAGE & TRANSFER, a Montana corporation;
and A.T. KLEMENS & SONS, a Montana corporation,

        Defendants, Appellants and Respondents.



FILED

AUG - 2 1991

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

---

THE GALLERIA PARTNERSHIP, et al.,
a Montana general partnership,

        Counterclaimants, and Third-party Plaintiffs,

   -vs-

THE TRUSTEES OF THE WASHINGTON-IDAHO-MONTANA
CARPENTERS-EMPLOYERS RETIREMENT TRUST FUND
and THE TRUSTEES OF THE LABORERS A.G.C.
PENSION TRUST OF MONTANA,

        Counter-defendants, and

COMPASS GROUP, INC., a Washington corporation,
and OLD NATIONAL BANCORPORATION, a Delaware corporation,

        Third-party Defendants.

---

MARBLE'S MOVING, STORAGE & TRANSFER, INC.,
a Montana corporation,

        Cross-claimants and Third-party Plaintiff,

   -vs-

THE GALLERIA PARTNERSHIP,
a Montana general partnership, et al.,

        Cross-Defendants, and

DANIEL W. COOK, KENT BRAY, MARVIN HESSLER,
DELVIN TROST, JAMES McKEAGUE, DONALD FISHER,
ROBERT C. PATTERSON, ARTHUR C. WEST,
JAMES W. McDERMAND and JAMES D. MILLER,

        Third-party Defendants.

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Leonard H. Langen, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            K. Dale Schwanke; Jardine, Stephenson, Blewett &
            Weaver, Great Falls, Montana.

        For Respondent:

            William VanCanagan; Datsopoulos, MacDonald & Lind,
            Missoula, Montana.



                        Submitted on Briefs:   June 13, 1991

                                Decided:   August 2, 1991

Filed:

                        Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

The parties appeal from a June 15, 1990, judgment of the District Court of the Eighth Judicial District, Cascade County, Montana, valuing certain foreclosed property at $1,100,000 and awarding no interest on appellants' loan accrued from the date of the sheriff's sale to the date the new judgment was entered. We affirm.

The parties present the following issues:

1. Did the District Court abuse its discretion in determining the value of the Galleria property?

2. Was it appropriate for the Montana Supreme Court to suspend the accrual of interest on appellants' loan from the date of the sheriff's sale until date of entry of the new judgment?

In the first appeal, Trustees of Washington-Idaho-Montana Carpenters-Employers Retirement Trust Fund v. Galleria Partnership (1989), 239 Mont. 250, 780 P.2d 608, this Court affirmed the grant of deficiency judgment to the Trustees of Washington-Idaho-Montana Carpenters-Employers Retirement Trust Fund (Trustees) and remanded this case to the District Court for determination of the proper amount of deficiency judgment based upon the fair market value of the Galleria property. This Court held that the Galleria Partnership members were jointly and severally liable on the promissory note that they had signed individually and were liable for the deficiency judgment. In addition, if the fair market value

3

of the Galleria property were determined to be greater than $565,000, the price the Trustees bid on the Galleria property at the sheriff's sale, this Court instructed the District Court not to allow interest from the date of the sheriff's sale to the date the new judgment was entered. Galleria Partnership, 239 Mont. at 269, 680 P.2d at 619.

In 1982, sixteen individuals executed a promissory note for $1,200,000 payable to the Trustees. Under the terms of the promissory note, the individuals undertook jointly and severally to pay the principal sum of the note and accrued interest.

At about the same time, Galleria Partnership, composed of ten of the individuals who signed the promissory note and three additional persons, the Great Falls Investors, executed to Safeco Title Insurance Company as trustee, a trust indenture and security agreement to secure the principal sum of $1,200,000 and interest according to the terms of the promissory note.

The real property secured by the trust indenture was a warehouse, the Galleria building, which had been remodeled for leasing to various business tenants. The building had been purchased and remodeled in 1982 by Galleria Associates, managed by Dan Cook.

Cook had obtained a $1,950,000 appraisal of the Galleria property in its remodeled state to get a long-term loan to pay off Galleria Associate's interim construction loan. Cook sought to borrow the money from Compass, a wholly owned subsidiary of Old

4

National Bancorporation, specializing in handling loans of union pension trust funds. Because Cook was advised by Compass that Galleria Associates could not borrow from Trustees under the provisions of the Federal Employee Retirement Income Security Act (ERISA), he formed Galleria Partnership, to which Galleria Associates would eventually sell the property. Galleria Partnership qualified as a borrower under ERISA. Cook lined up the thirteen individuals and the Great Falls Investors that held varying fractions of interest in the partnership and eventually signed the trust agreement.

Cook owned an interest in several businesses owned by the tenants of the Galleria building. When Cook's economic situation deteriorated, many of the tenants could not pay their rents on a timely basis, making it difficult for Galleria Partnership to meet the $14,916 loan payments each month. Compass was aware of the reason for the late payments from Galleria Partnership and continued to accept the payments and late charges.

By early December, 1984, the November 1984 loan payment had not been paid. On December 11, 1984, Compass sent a default notice, accelerating the entire loan balance of $1,225,668.81 and demanding its payment within nine days. The default notice crossed in the mail with the November payment. Compass returned the payment with a letter reiterating its demand for the entire balance.

The parties were unable to reach a settlement on the

deficiency, and on April 12, 1985, the Trustees filed an action to foreclose on the trust indenture. The District Court, on October 29, 1987, granted summary judgment to the Trustees, determining that the trust indenture constituted a first lien upon the real property of Galleria Partnership, and issued a decree of foreclosure, ordering the Cascade County Sheriff to sell the real estate at public auction. The order of foreclosure reserved specifically the question of any deficiency judgment.

The sole bid received was $565,000 from the Trustees. Galleria Partnership appealed the validity of the deficiency judgment. As noted above, this Court affirmed the District Court's judgment, and remanded this case to determine the fair market value of the property at the time of the sheriff's sale, December 8, 1987. "Fair market value" was defined as the "intrinsic" value of the property at the time of sale without consideration of the effect of foreclosure proceedings on the fair market value. Galleria Partnership, 239 Mont. at 265, 780 P.2d at 617.

On remand, at a hearing held March 2, 1990, the District Court heard testimony from witnesses and received into evidence reports prepared by various appraisers and an order of the State Tax Appeal Board.

William Ferro, a certified Member of the American Institute (MAI) Real Estate Appraisers from Great Falls, Montana, was the sole witness for the Trustees. Ferro defined "fair market value" as the "most probable price . . . for which the appraised property

will sell in a competitive market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably and for self-interest, and assuming that neither is under undue stress."

According to Ferro, three methods are used for valuation of property. The first, the "income" approach, is an analysis of the income-producing capabilities of a building, "of primary importance to income producing property since investors and purchasers . . . are buying that property based on how much income the property can produce and what return they can get on their investment." The other two methods of valuation are the "cost" approach, analyzed by replacement cost less "economic, functional, or physical depreciation," and the "market" approach, analyzed by comparisons of the property with recent sales of other commercial properties. Ferro said that a full narrative appraisal of fair market value would include all three methods of valuing the property.

### Ferro's 1987 and 1988 Appraisals

Ferro, on behalf of the Trustees, had made two appraisals of the Galleria property. Ferro described the first appraisal as an "evaluation," using a market approach, and the January 1988 appraisal as a fair market analysis using an income approach.

The first appraisal, dated November 9, 1987, set the value of the Galleria property between $256,000 and $325,000, based on sales of other commercial property in Great Falls. Ferro categorized Great Falls office space as "good quality," "average quality," or

7

"lower quality," identifying the Galleria building as having "lower quality" office space. In calculating the appraisal figures, he deducted the costs of clean-up, maintenance, and renovation, ranging from $100,000 for general clean-up and maintenance to $400,000 for major remodeling.

On January 1, 1988, Ferro updated his first appraisal for the purpose of an appeal before the State Tax Appeal Board concerning the Galleria property, arriving at a fair market value of $266,500. Ferro used the income approach as the "most applicable approach for investment properties."

According to a September 22, 1989, order of the State Tax Appeal Board, the parties stipulated to an appraised value of $562,736 for the Galleria property.

Steven Hall, MAI appraiser testifying for Galleria Partnership, rated Ferro's $256,000 to $325,000 evaluation of the Galleria property as very low for "45,000 square feet of gross building area" in "the heart of the central business district of Great Falls." He pointed out that Ferro's valuations were lower than the $565,000 bid at the sheriff's sale, a value normally less than fair market value; that the basement area was not non-rentable, but previously had been rented for a substantial amount; and that problems with water in the basement required only minor repairs. In Hall's opinion, comparisons with the sales of other commercial properties were invalid because of the few number of sales and the uniqueness of the Galleria property.

8

## Hall's 1990 Appraisal

Steven Hall, MAI real estate appraiser from Missoula hired by Galleria Partnership, testified that the "intrinsic" value of the Galleria property as of December 1987 was $1,595,000. Hall said that his appraisal was not a "valuation," requiring an analysis of the property's market value, but an "evaluation," defining the market under special guidelines. The special guidelines used by Hall to find the "intrinsic" value involved a "consideration of the replacement cost new of a property and then allowing for the property's depreciation in the form of physical deterioration, its functional obsolescence, if any, its anticipated serviceable life and the general usefulness of the item involved."

The Trustees again called Ferro as a witness to critique Hall's appraisal. Ferro questioned Hall's attributing all of the above-average short-term depreciation of the Galleria property to the foreclosure situation without taking into account poor maintenance and the deteriorating Great Falls economy. Ferro said that Hall's definition of "intrinsic" value was "very narrow" and could not "be related to fair market value in any way."

Ferro testified that "intrinsic" value, as defined by the American Institute of Real Estate Appraisers, is the amount of money equivalent to the worth inherent in the thing itself; for example, the intrinsic value of a bronze medal is the worth of the tangible assets separated from the intangible assets. According to the MAI manual, "intrinsic value" is "[s]trictly a misuse of the

9

word value, since value depends upon extrinsic things; that is, the attitude of persons toward the thing valuable."

## Stevens' 1985 Appraisal

Allen Bloomgren, one of the partners of Great Falls Investors and a member of the executive committee of Galleria Partnership, testified for Galleria Partnership about events surrounding the acceleration of the loan and foreclosure action. Bloomgren also commented on an August, 1985, appraisal of the Galleria property by Thomas Stevens, submitted into evidence by Galleria Partnership.

Stevens, an MAI appraiser from Missoula, Montana, had estimated the value of the property to be $925,000 according to the income approach, $1,050,000 according to the cost approach, and $925,000 according to the market value approach. The "final indication of value" was $1,100,000. Bloomgren said that he had expected the appraisal to be about $1,500,000 and opined that the Stevens' appraisal figures were too low, alleging various errors in Stevens' analysis.

## Stanton's 1985 Estimation Based on Stevens' Appraisal

Galleria Partnership also submitted into evidence a November 11, 1985, critique of Stevens' appraisal by Ben E. Stanton, an MAI appraiser from Bozeman, Montana. Although Stanton felt that Stevens accurately described the physical shortcomings of the Galleria building and correctly analyzed the current economic situation in Great Falls, he disagreed with Stevens' optimistic view of future economic growth in Great Falls. Consequently, he

10

could give "no credence" to the values derived by Stevens in analyzing the cost approach. Stanton noted that the Galleria building was in a "very secondary location in the city with surroundings tending more towards old industrial structures than those desirable around an office building."

These factors meant lower rental rates than estimated by Stevens, resulting in a lower value using the income approach than Stevens had estimated. Stanton's own analysis of the income approach set the value of the Galleria property at $565,000. Stanton emphasized that this figure was not an appraisal of the Galleria property, but only a "probable approach by this reviewer based on the data in Mr. Stevens' report."

Other Testimony

Mick Miller, a Great Falls insurance agent for the company carrying casualty insurance on the Galleria property, testified that the amount of insurance carried on the Galleria building was $1,950,000, an amount that Miller derived by calculating the replacement cost, according to a manual provided by his company, minus depreciation. On cross-examination Miller admitted that he was not an MAI appraiser.

Darryl Meyer, manager of the Galleria building until July, 1986, testified about the reluctance of prospective tenants to rent space in the building after the foreclosure proceeding was initiated. Meyer also described the general condition of the building while he was manager.

11

At the conclusion of testimony, the District Court determined the value of the Galleria property to be $1,100,000. From this judgment, both parties appeal.

I

Did the District Court abuse its discretion in determining the value of the Galleria property?

The Trustees maintain that the District Court's $1,100,000 valuation of the Galleria property has no reasonable relation to its "fair value" at the time of sale and that the District Court should have sustained the $565,000 bid by the Trustees at the sheriff's sale.

Galleria Partnership argues that the District Court erred by failing to determine on remand the "intrinsic" value of the Galleria property as of December 1987 and alleges that the District Court failed to exercise its equitable powers to arrive at a fair valuation. Specifically, Galleria Partnership maintains that the Trustees had the burden of proof and failed to meet their burden of producing evidence demonstrating the "intrinsic" value of the property. According to Galleria Partnership, the appraisal by Mr. Hall, who testified that the value was $1,595,000, was the only evidence of the intrinsic value of the Galleria property.

Generally, "[t]he party who has the burden of proof shall first produce his evidence; the adverse party will then produce his evidence." Section 25-7-301(3), MCA. "[A] party has the burden of persuasion as to each fact the existence or nonexistence of

12

which is essential to the claim for relief or defense he is asserting." Section 26-1-402, MCA.

The District Court directed the Trustees to present their case first, but did not determine which party had the burden of proof. Galleria Partnership was the party upon which it was incumbent to show that the fair market value was more than the price bid by the Trustees. That the mortgagor has the burden of proof in showing the fair market value in relation to the amount bid on real property at a judicial sale is implied by our decision in Federal Savings and Loan Insurance Corp. v. Hamilton (1990), 241 Mont. 367, 786 P.2d 1190. We concluded that a mortgagor could not invoke this Court's equity jurisdiction to remand the case for determination of fair market value of the property at the time of the sheriff's sale when the mortgagors failed to produce evidence showing fair market value. Hamilton, 241 Mont. at 371, 786 P.2d at 1193.

Whichever party had the burden of proof, the District Court, in rejecting one witness' estimation of intrinsic value, was not bound to adopt the other party's appraisal. We remanded this case in the first place because the determination of property valuation is a factual issue which is within the province of the trial court to decide. When reviewing findings of fact, this Court is precluded from substituting its judgment for that of the trier of fact, and cannot set aside the findings of a court sitting without a jury unless the findings are "clearly erroneous." Rule 52(a), M.R.Civ.P. Findings of fact are not clearly erroneous when based

13

upon substantial credible evidence. Downing v. Grover (1989), 237 Mont. 172, 178, 772 P.2d 850, 853.

Generally, a district court is vested with broad discretion in valuation of real property and can adopt any reasonable valuation supported by the record. In re Marriage of Becker (Mont. 1990), 798 P.2d 124, 128, 47 St.Rep. 1729, 1733; Lee v. Verex Assurance, Inc. (Nev. 1987), 746 P.2d 140, 142. A district court may average the values given by experts to arrive at an equitable solution. In re Marriage of Goodmundson (1982), 201 Mont. 535, 539, 655 P.2d 509, 511.

Galleria Partnership argues that the District Court cannot average the values in this instance, when one party presented an "intrinsic" valuation of the Galleria property at the time of the sheriff's sale and the other failed to introduce an "intrinsic" value, but instead gave an "inherent" value of the property.

The Trustees advocate using a definition of "intrinsic" value similar to the definition of "fair" or "real" value used by Wisconsin courts in determining whether the bid at a judicial sale, when the only bidder is the mortgagee, is substantially inadequate. The "fair" value is the "price which a person willing and able to buy the property would reasonably pay for it, not for purposes of speculation, but for that use to which it has been or reasonably may be put." First Wisconsin National Bank of Oshkosh v. KSW Investments, Inc. (Wis. 1976), 238 N.W.2d 123, 128. As our discussion will demonstrate, the definition of fair market value

14

in <u>Galleria Partnership</u> is adequate.

In <u>Galleria Partnership</u>, we defined "fair market value" as "the intrinsic value of the real property with its improvements at the time of sale under judicial foreclosure, without consideration of the impact of the foreclosure proceedings on the fair market value." <u>Galleria Partnership</u>, 239 Mont. at 265, 780 P.2d at 617. Most importantly, we left the <u>method</u> of determining fair market value to the District Court. <u>Id</u>.

The source of the definition of "fair market value" used in <u>Galleria Partnership</u> was our decision in First State Bank of Forsyth v. Chunkapura (1987), 226 Mont. 54, 734 P.2d 1203. In <u>Chunkapura</u>, we discussed the provisions of California law relating to sales under judicial foreclosure and the opinion of a California court defining "fair value" as the term was used in the Code of Civil Procedure. <u>Chunkapura</u>, 226 Mont. at 61, 734 P.2d at 1207 (citing Rainer Mortgage v. Silverwood Ltd. (Cal. App. 3 Dist. 1985), 209 Cal. Rptr. 294).

As noted in the California decision, because foreclosure sometimes depresses the value of property, even to the extent that it becomes "valueless," the mortgagor should receive the "underlying" or "intrinsic" value of the property. <u>Rainer</u>, 209 Cal. Rptr. at 298. Under normal conditions the "fair value," or "intrinsic value," of property will often coincide with its fair market value, the value a willing purchaser will pay to a willing seller in an open market. <u>Id</u>. The court explained:

15

> This correlation is not fixed, however, and market value is only <u>one factor</u> the court should consider when determining "fair value." . . . "[F]air value" is to be determined <u>by all of the circumstances affecting the intrinsic value of the property at the time of the sale</u>. This necessarily excludes the circumstances of the foreclosure sale.

<u>Rainer</u>, 209 Cal. Rptr. at 298 (emphasis added).

The appraisers whose testimony or reports were received into evidence described several different methods of valuing the Galleria property and recounted in detail the many factors affecting their valuations. Few of them relied purely on a fair market value analysis.

Mr. Ferro's first evaluation was based primarily on a market approach, comparing the Galleria property with other commercial properties which had been sold recently in Great Falls. To arrive at the final valuations of $256,000 to $325,000, Ferro deducted amounts ranging from $100,000 to $400,000 for renovations. He testified that his second appraisal used an income approach analyzing the income-producing capabilities of the property.

Mr. Hall's $1,595,000 evaluation was based on a cost approach, estimating the replacement cost of the Galleria property less the varying types of depreciation.

Mr. Stevens, who did not testify but whose 1985 appraisal was submitted into evidence, had analyzed the worth of the Galleria property using all three approaches and had arrived at a final fair market value of $1,100,000. Based on his analysis of economic factors affecting the income approach, Mr. Stanton set a value of

$565,000.

The experts assessed the weaknesses of the other appraisers' methods and bases of valuations. In addition, Galleria Partnership presented witnesses who testified that the repairs or renovations necessary to the Galleria building at the time of the foreclosure sale were not nearly as extensive as envisioned by Ferro.

Our review of the record convinces us that the District Court had heard all of the circumstances affecting the valuation of the Galleria property. With such disparate figures, the District Court was entitled to discount the appraisals of the Trustees' expert, Mr. Ferro, and Galleria Partnership's expert, Mr. Hall. Since the method of valuation was left to the District Court, we find no abuse of discretion in its rejection of both values as unfair estimations of the intrinsic value of the Galleria property.

The District Court states in its judgment that it did not rely on Stevens' appraisal in setting the value of the property at $1,100,000, the same final figure for which Stevens had appraised the property in 1985. Nonetheless, the Stevens' appraisal, as a thorough analysis of all three approaches to valuation, comprises substantial evidence supporting the District Court's decision. Having been completed after the Trustees foreclosure action was filed, but two years before the foreclosure sale while the Galleria building was still occupied and maintained, the Stevens' appraisal may approximate most closely the value of the Galleria property at the time of the sheriff's sale, without taking into account the

17

impact of the foreclosure proceedings.

In addition, the $565,000 figure which the Trustees claim represents "a fair determination of intrinsic value," is based upon a critique of Stevens' appraisal by Mr. Stanton, rather than an appraisal. Stanton emphasized in his report that the $565,000 estimate of value according to the income approach was not an appraisal, but merely a "probable approach" based on data from Stevens' report. The District Court did not abuse its discretion in disregarding the $565,000 value since it was the only approximation of the value of the Galleria property which was not based on an appraisal.

We hold that the District Court relied on substantial, credible evidence in determining the fair market value of the Galleria property, without taking into consideration the effect of judicial foreclosure proceedings on the property's value.

II

Was it appropriate for the Montana Supreme Court to suspend the accrual of interest on appellants' loan from the date of the sheriff's sale until date of entry of the new judgment?

The Trustees attack this Court's directive in Galleria Partnership to suspend the interest accruing on the loan from the date of the sheriff's sale to the date of entry of the new judgment as contrary to prevailing law. See Galleria Partnership, 239 Mont. at 269, 780 P.2d at 619.

In relation to interest on judgments the Rules of Appellate

Procedure provide:

> If a judgment for money in a civil case is affirmed, whatever interest is allowed by law shall be payable from the date the judgment was rendered or made in the district court. If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest.

Rule 31, M.R.App.P. Although the Trustees are correct in asserting that the District Court's judgment was not reversed, the judgment was modified in respect to the amount allowed for the deficiency. Since "instructions with respect to allowance of interest," as mandated by Rule 31, were provided, the directive to suspend interest until entry of the new judgment if the fair market value were determined to exceed $565,000 was appropriate and in accordance with the Rules of Appellate Procedure.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

19